Declaration

1. My name is Robert C. Roth. I am an attorney licensed to practice in the State of Illinois and the U.S. District Court for the Northern District of Illinois, general and trial bars. My ARDC number is 6190426. I was admitted to practice in Illinois on November 7, 1985 and the US District Court on May 23, 1986.

2. My legal practice has specialized in military law since my appointment as a judge advocate officer in the U.S. Air Force on July 9, 1987. As a judge advocate, I served on active duty in the Air Force from August 4, 1987 – August 3, 1993. I then received appointment as a judge advocate in the Illinois Army National Guard and as a Reserve of the U.S. Army on August 25, 1993. I served as an Army National Guard judge advocate, in various duty assignments and capacities, until my retirement on August 31, 2017. During that time, I served on active duty in the U.S. Army from September 29, 2008 – October 1, 2009, during which time I deployed to Afghanistan and served as Staff Judge Advocate of Combined Joint Task Force Phoenix VIII, headquartered in Kabul. From March 16, 2007 – August 31, 2017 (with the exception of the previous dates) I served as Staff Judge Advocate of the Illinois National Guard, in a full-time National Guard duty/Active Guard Reserve (AGR) status, under 32 U.S.C. §502(f) and 32 U.S.C. §328. On August 31, 2017, I retired from the U.S. Army with the rank of Colonel.

3. As a judge advocate in the U.S. Air Force and the Army/Army National Guard, my practice focused on all aspects of military law, to include Service Members' reemployment rights under Federal and State laws. I received training in this area at various courses administered by The Judge Advocate General's schools of the Army and the Air Force. Among my duties were to train and advise Service Members, staffs and commanders on Service Members' reemployment rights, in particular those of Illinois National Guard members under the Uniformed Services Employment and Reemployment Rights Act (USERRA), 38 USC §§4301-4334.

4. From September 1, 2017 to the present, I have been employed by the Illinois Department of Military Affairs as General Counsel. In that capacity, I am the senior civilian legal advisor to The Adjutant General of Illinois, the director of the Department of Military Affairs and the Commander of the Illinois National Guard.

5. As a judge advocate in the Illinois National Guard and legal advisor to the Department of Military Affairs, my daily legal practice has required me to develop expertise in the area of military personnel law, particularly as it pertains to the various duty statuses in which National Guard members train and perform duty. In general, all National Guard members perform active and inactive duty training, what is commonly referred to as Federally-mandated training, under the provisions of Title 32, U.S. Code, usually under 32 U.S.C. §502(a).

6. The purpose of National Guard training under Title 32, U.S. Code, is to ensure that members and units of the National Guard are ready to perform Federal missions in their status as members of the National Guard of the United States, which are reserve components of the Army and the Air Force, respectively, under 10 U.S.C. §§10101. Members of the National Guard are simultaneously members of the organized Militia of their State and Reserves of the Army or Air Force, respectively. 10 U.S.C. §§10105, 10111.

7. National Guard duty and training under Title 32, U.S. Code, of whatever type, is conducted and administered by the States in accordance 32 U.S.C. §501, and paid for by the Federal government. A recent article discusses some of the legal authorities for the President to use the National Guard or the armed forces to assist in securing the southwestern border. As the attached article also discusses, under 32 U.S.C. § I 12, the Secretary of Defense may grant funding to the governor of a state who submits a "drug interdiction and counterdrug activities plan" that satisfies certain statutory requirements. The Secretary of Defense is charged with examining the sufficiency of the drug interdiction plan and determining whether the distribution of funds for its implementation would be proper. Congressional Research Service - Legal Sidebar, "The President's Authority to Use the National Guard or the Armed Forces to Secure the Border," April 19, 2018, Jennifer K. Elsea, copy attached as Attachment 1.

8. Title 32, U.S.C. duty and training orders issued are issued in the name of the Governor, by the State Department of Military Affairs, and contain an Army or Air Force authority line and fund citation for purposes of Federal pay and allowances. This includes full-time National Guard-counter drug duty, authorized under 32 U.S.C. §502(f) and 32 U.S.C. §112.

9. National Guard personnel conducting duty and training under Title 32, U.S.C. are not restricted from conducting law enforcement activities by the Posse Comitatus Act ("PCA"), 18 U.S.C. 1385. United States v. Hutchings, 127 F.3d 1255, (10th Cir.,1997). "The National Guard can be deployed on law enforcement missions without legislation because, as a state entity, it is not subject to the PCA." "Reexamining the Posse Comitatus Act : Toward a Right to Civil Enforcement," Yale Law and Policy Review, vol. 21:383, 2003, pp. 414-415. This is because the National Guard in State service is not considered a part of the U.S. Armed Forces and is statutorily excepted from the PCA's restrictions. See Clark v. U.S. 322 F.3d 1358 (Fed. Cir., 2003), clarifying "that the National Guard [of a State] and the National Guard of the United States are separate and distinct entities…[and that under Perpich v. Department of Defense, 496 U.S. 334 (1990)] members of the National Guard only serve in the federal military when they are formally called into the military service of the United States. At all other times, National Guard members serve solely as members of the State militia, under command of a state governor." 322 F.3rd at 1366. Furthermore, the PCA "has been uniformly interpreted to apply to National Guard members only when they are in federal service and not when they are in the service to their states."

<u>Ibid</u>. " This uniform interpretation means that, since Title 32, USC, duty or training is State service, National Guard personnel performing this duty or training are not restricted by the provisions of the PCA. 32 U.S.C. §501(b).

10. National Guard personnel in a 32 U.S.C. §502(f) status frequently perform law enforcement duties to assist Federal, State or local law enforcement agencies, to include counter-drug activities. In fiscal year (FY) 2015, National Guard Counter-Drug operations assisted civilian law enforcement agencies in seizing $8.4 billion worth of illicit drugs, supported 24,880 cases nationwide, and contributed to dismantling more than 2,866 drug trafficking organizations. 2017 National Guard Bureau Posture Statement, p. 16, copy attached as Attachment 2.

11. 32 U.S.C. §112(g) simply reiterates existing and well-settled law, that the National Guard is not restricted from engaging in law enforcement activities, except when "in Federal service…", i.e. active duty under the provisions of Title 10, U.S. Code. By authorizing the States to place National Guard personnel in full-time National Guard duty under 32 U.S.C. §502(f) full-time National Guard duty to carry out drug interdiction and counter-drug activities, 32 U.S.C. §112(b) ensures that it is absolutely clear that PCA does not restrict the National Guard from carrying out those activities.

12. The "National Guard is unique in that it performs federal missions under the command and control of the President [federal status] and state missions under the command and control of the Governors [state status]. In some circumstances, National Guard activities that are under state control can be federally funded…National Guard members train for their federal mission under state control with federal funding. Federal law also authorize federal funding for some other state-controlled missions, such as the National Guard's counterdrug support operations…" U.S. Government Accountability Office (GAO), "Enhanced National Guard Readiness for Civil Support Missions May Depend on DOD's Implementation of the 2008 National Defense Authorization Act," April 2008, (GAO-08-311), p. 9. To illustrate, see Table 1 in GAO Report 08-311, laying out the three (3) duty statuses the National Guard operates in. Copy attached as Attachment 3. Included under "State role," is duty under 32 U.S.C. §502(f) – commanded by the Governors, paid for by the Federal government, examples of which includes post-911 airport security, disaster response after Hurricane Katrina, and southwest border patrol, and not restricted by PCA. Another example is full-time National Guard duty – counterdrug, under 32. U.S.C. §112. It is *state service* because it is under the command and control of the States; it is *under federal authority* because it is authorized by federal law and funded by the federal government.

13. It is considered well-settled within the military legal community that any and all forms of National Guard duty and training under Title 32, U.S.C. confer protections under USERRA. <u>See</u> for example the "National Guard Duty Status Chart" in "Military Justice in the National Guard: A Survey of the Laws and Procedures of the States, Territories, and the District of Columbia," <u>The Army Lawyer,</u> December 2007, 30, Appendix C, at p. 66, a copy attached as Attachment 4. As the chart indicates, all forms of Title 32 training or duty are covered by USERRA. The reason is that the definition of "uniformed services in in the statute provides that National Guard personnel" are protected by USERRA "when engaged in active duty for training, inactive duty training, or <u>full-time National Guard duty</u>..." 38 U.S.C. §4303(16). Emphasis added. The terms "Army National Guard," "Air National Guard," active duty for training", "inactive duty training," and "full-time National Guard duty" are defined in 10 U.S.C. §101(c) and (d) and 32 U.S.C. §101.

14. I am not aware of any statutory provision or case law that distinguishes counter-drug full-time National Guard duty from any other form of full-time National Guard duty as that term is used and applied under USERRA.

I declare under penalty of perjury under 28 U.S.C. §1746 that the foregoing is true and correct. Executed on July 17, 2018.

*[signature]*

Robert C. Roth

4



**Legal Sidebar**

# The President's Authority to Use the National Guard or the Armed Forces to Secure the Border

Jennifer K. Elsea
Legislative Attorney

April 19, 2018

President Trump's recent announcement and memorandum to the Attorney General and the Secretaries of Defense and Homeland Security regarding the possibility of deploying the military to help guard the U.S.-Mexican border against aliens entering the country unlawfully as well as to stop the flow of drug and gang activity raise questions regarding his statutory or constitutional authority to do so. The answer may depend on which troops are sent and the role they will play. This sidebar addresses the legal authorities for the President to use the National Guard or the armed forces to assist in securing the southwestern border.

## Memorandum and Recent Precedent

Declaring the situation at the border to have reached a point of crisis characterized by lawlessness, the President in the memorandum directs the Secretary of Defense to request the use of National Guard troops to assist in securing the southern border to "stop the flow of deadly drugs and other contraband, gang members and other criminals, and illegal aliens," pursuant to Title 32 authority. (In "Title 32 status," National Guard members remain under the control of the governors of their home states and are not considered to be performing federal service.) The memorandum also directs the Secretary of Defense and the Secretary of Homeland Security to confer with the Attorney General in the preparation of an action plan recommending the use of other available executive authorities to be invoked for border protection.

There is precedent for deploying National Guard units to the southwestern border to assist with immigration control. In 2006-2008, President George W. Bush called on the National Guard to participate in Operation Jump Start, in which National Guard troops were called to duty in order to provide assistance to the U.S. Customs and Border Protection (CBP) to secure the southwestern border. National

Congressional Research Service
7-5700
www.crs.gov
LSB10121

Guard members participating in this operation did not serve in a direct law enforcement role, but rather reinforced the U.S. Border Patrol, including by performing missions involving engineering, aviation, entry identification teams and a wide range of technical, logistical and administrative support. President Barack Obama used National Guard troops in a similar role in 2010 during Operation Phalanx, a successor operation to Operation Jump Start.

## The National Guard

Section 502 of Title 32, U.S. Code, provides the authority for the Secretary of the Army and the Secretary of the Air Force to call National Guard units to active duty under Title 32 status for training purposes. However, it also permits individual members to be called to active duty to perform training "or other duty in addition to" the mandatory training described earlier in section 502. This is the provision of law that was used to provide federal pay and benefits to the National Guard personnel who provided security at many of the nation's airports after September 11 and who participated in Hurricanes Katrina and Rita-related disaster relief operations. Title 32 authority under section 502(f) was also used for Operation Jump Start and Operation Phalanx, discussed above. Although National Guard members did not engage in direct law enforcement activities during these two border security operations, it is possible that states might consider giving them that authority in future operations.

As a matter of statute, section 502(f) "other duty" may also include "homeland defense activities." Such activities are defined to mean activities:

> undertaken for the military protection of the territory or domestic population of the United States, or of infrastructure or other assets of the United States determined by the Secretary of Defense as being critical to national security, from a threat or aggression against the United States.

If the action plan under the President's memorandum is determined to involve homeland defense activities, federal funding for some aspects may be available upon a determination by the Secretary of Defense that the participation of National Guard units or members for a qualifying operation is necessary and appropriate. The governor of a state wishing to use its National Guard resources for homeland defense activities may also request funding assistance.

There is also provision for National Guard troops to be called to duty for drug interdiction operations at the state level. Federal funding may be provided to a state for the implementation of a drug interdiction program in accordance with 32 U.S.C. §112. Under this section, the Secretary of Defense may grant funding to the governor of a state who submits a "drug interdiction and counterdrug activities plan" that satisfies certain statutory requirements. The Secretary of Defense is charged with examining the sufficiency of the drug interdiction plan and determining whether the distribution of funds for its implementation would be proper. It appears that a state plan might include border security and immigration-related functions that overlap with drug interdiction activities.

## The Armed Forces

In the event the use of the regular armed forces is recommended to assist in securing the border, a number of legal considerations may arise. For example, the use of the military to enforce immigration or criminal laws at the border could run afoul of the Posse Comitatus Act, unless an exception applies. The Posse Comitatus Act is a criminal prohibition that provides:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both.

Consequently, there must be a constitutional or statutory authority to use federal troops in a law enforcement capacity to stop aliens from entering the country unlawfully, or to apprehend gang members or seize contraband. (The Posse Comitatus Act does not apply to the National Guard unless it is activated for federal service.)

The Constitution empowers Congress to authorize the militia to be called forth to execute federal law. Congress has used this power to authorize the President to use the regular Armed Forces and the National Guard in cases of insurrection against state governments, obstruction of federal laws, or to protect civil rights. These authorities permit the use of federal armed forces to execute a law enforcement role notwithstanding the Posse Comitatus Act. It also seems well settled that the President has the constitutional authority as Commander in Chief to employ the armed forces to defend against an armed attack against the United States, its territories, or armed forces.

The armed forces do not appear to have a direct legislative mandate to protect or patrol the border or to engage in immigration enforcement. Chapter 15 of Title 10, U.S. Code —Military Support for Civilian Law Enforcement Agencies, however, provides general legislative authority for the armed forces to provide certain types of support to federal, state, and local law enforcement agencies, in particular in counterdrug and counterterrorism efforts. Such authorities might permit the military to provide indirect border security and immigration control assistance. These authorities permit the Department of Defense (DOD) to share information collected during the normal course of military operations; loan equipment and facilities; provide expert advice and training; and maintain and operate equipment. For federal law enforcement agencies, military personnel may be made available to maintain and operate equipment in conjunction with counterterrorism operations or the enforcement of counterdrug laws, immigration laws, and customs requirements. Military personnel are permitted under this authority to maintain and operate equipment only for specific purposes, including aerial reconnaissance and the detection, monitoring, and communication of air and sea traffic, and of surface traffic outside the United States or within 25 miles of U.S. borders, if first detected outside the border.

Congress placed several stipulations on Chapter 15 assistance. For example, the recipient law enforcement agency must reimburse DOD for the support it provides unless the support "is provided in the normal course of military training or operations" or if it "results in a benefit ... substantially equivalent to that which would otherwise be obtained from military operations or training." Also, DOD can only provide such assistance where it does not adversely affect "the military preparedness of the United States." Moreover, Congress incorporated posse comitatus restrictions into Chapter 15 support activities, providing that the authorized assistance "does not include or permit direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law."

With respect to counterdrug operations and activities to counter other transnational crimes along the border, Congress in 1989 began to expand the military's support role in a number of other ways. For example, Congress directed DOD, to the maximum extent practicable, to conduct military training exercises in drug interdiction areas, and made the DOD the lead federal agency for the detection and monitoring of aerial and maritime transit of illegal drugs into the United States. Congress later provided additional authorities for military support to law enforcement agencies specifically for counterdrug purposes in the National Defense Authorization Act for FY1991. Section 1004 authorized DOD to extend support in several areas to any federal, state, and local (and sometimes foreign) law enforcement agency requesting counterdrug assistance, subject to restrictions against military direct participation in law enforcement. This section was extended a number of times but was repealed at the end of 2016, when it was superseded by similar authority now codified at 10 U.S.C. §284 to provide assistance in drug interdiction and activities to control transnational organized crime. The authorized assistance is limited to maintenance or upgrade of equipment; transportation of personnel; establishment and operation of operations or training bases; training of law enforcement personnel; detecting and monitoring traffic

within 25 miles of the border; road and fence construction; light installation along smuggling corridors; the establishment of command and control centers and computer networks; the provision of linguist and intelligence analysis services; and aerial and ground reconnaissance.

As noted, these Chapter 15 authorities restrict military personnel from participating directly in law enforcement activities, but military reconnaissance patrols on the border may be armed and permitted to fire in self-defense under applicable rules of engagement. Controversy arose in 1997 after a group of U.S. Marines conducting drug interdiction surveillance fired upon and killed an American teenage goatherd they believed posed a threat.



2017 NATIONAL GUARD BUREAU POSTURE STATEMENT

BUILDING READINESS TO MEET EVOLVING GLOBAL AND HOMELAND NEEDS



# TABLE OF CONTENTS

**3** CNGB EXECUTIVE OVERVIEW

**11** FIGHTING AMERICA'S WARS
- Providing ready forces to the Army and Air Force who can fight in an array of complex environment
- Offering capacity and capability at a tremendous value for our nation

**13** SECURING THE HOMELAND
- Combat organization and training enables unsurpassed domestic capability at home in times of large-scale emergency or disaster response

**18** BUILDING PARTNERSHIPS
- Missions evolve into enduring relationships with strategic impact
- Collaborating at the international, state and local levels

**20** SOLDIERS, AIRMEN AND FAMILIES
- A competent, capable, diverse, and healthy force
- Outreach to state, county and local communities

Case: 1:17-cv-07938 Document #: 47-1 Filed: 07/18/18 Page 11 of 17 PageID #:487



# SECURING THE HOMELAND

Combat organization and training enables unsurpassed capabilities at home in times of large-scale emergency or disaster response

**2017 NATIONAL GUARD BUREAU POSTURE STATEMENT**

Case: 1:17-cv-07938 Document #: 47-1 Filed: 07/18/18 Page 12 of 17 PageID #:488



## SECURING THE HOMELAND

- Living and working in nearly 2,600 communities, the National Guard is often the face of the military across the nation. It connects the U.S. military to America.

- National Guard forces were called upon 286 times and logged more than 547,100 man-days responding to emergencies in the homeland in FY15.

- National Guard elements responded to 80 natural disaster, wildfire and severe weather homeland events in FY15. Nearly 1,500 Guardsmen were called each day (on average) to respond to homeland emergencies in FY15.

- The Air Guard protects America's skies by providing command and control, fighter and aerial refueling response. They average 1,200 sorties per month and have logged more than 63,500 sorties since 9/11 in support of NORAD.

- The 57 National Guard Weapons of Mass Destruction Civil Support Teams were involved in nearly 3,500 responses (579 exercise, 143 response, 1,108 stand-by and 1,668 assists), providing advice and capability to civilian responders in FY15.

- Nearly 14,000 National Guard Soldiers and Airmen comprise 66 percent of the Defense Department's chemical, biological, radiological, nuclear (CBRN) response capability, to include 17 CBRN Enhanced Response Force Packages and 10 regionally aligned Homeland Response Forces.



2017 NATIONAL GUARD BUREAU **14** POSTURE STATEMENT



**2017 NATIONAL GUARD BUREAU 15 POSTURE STATEMENT**

**SECURING THE HOMELAND**

## SECURING the HOMELAND

- Air Guard C-130 crews, equipped with Modular Airborne Firefighting Systems, flew a total of 88 sorties and dropped more than 246,000 gallons of fire retardant on wildfires in FY15 in support of the National Interagency Fire Center.

- Guardsmen live within and serve in nearly every ZIP code. In a domestic emergency response, the equation is simple: Less time and distance = more lives saved.

- To date, Air Guard search and rescue units in Alaska, California and New York have completed more than 6,000 search and rescue missions, saving more than 3,000 lives, while providing 24 / 7 rescue coverage.

- Air Guard members performed 5,355 man-days of engineer, construction and medical missions as part of Innovative Readiness Training in FY15 providing critical services to underserved American communities while gaining real-world training opportunities that keep them prepared for wartime missions. Nearly 150 Army Guard Soldiers from 3 states also completed 4 different IRT projects.





## SECURING THE HOMELAND

- Closely tied to both the Department of Defense and the Office of National Drug Control Policy, the National Guard Counterdrug Program (NG CDP) supports the detection, interdiction, disruption, and curtailment of Transnational Criminal Organizations (TCOs) involved in drug trafficking and other national security threats to the homeland.

- Counterdrug state operations personnel assisted law enforcement agencies (LEAs) in taking a total of $8.4 billion worth of illicit drugs off the street in FY15.

- Acting as force multipliers for LEAs, NG CDP analysts supported more than 24,880 cases nationwide. They contributed to disrupting / dismantling more than 2,866 drug trafficking organizations.

- National Guard Counter Threat Finance analysts helped identify 599 money laundering methods and 902 money laundering targets. LEA investigations included: outlaw motorcycle gangs on the Northern border, TCOs on the Southwest border, financial institutions and front companies with links to narco-terrorism, precursor chemical diversion, drug trafficking, and money laundering.

- Counterdrug Aviators flew 16,420 reconnaissance hours in support of LEAs and assisted with the seizure of more than $1 billion in illicit drugs, weapons, property, and currency.

- Civil operations specialists supported more than 500 anti-drug community-based organizations (CBOs), state and federal agencies. They used their military skills to help CBOs identify local resources and develop partnerships to help shape strategic community engagements.

- The five National Guard Counterdrug Training Centers hosted 667 iterations of 159 drug interdiction and counterdrug courses to military personnel, law enforcement officers, and CBOs in FY15. The total number of students trained: 61,173 (22,889 in house and 38,284 through distance learning).



**COUNTER-DRUG**

2017 NATIONAL GUARD BUREAU **16** POSTURE STATEMENT



**2017 NATIONAL GUARD BUREAU 17 POSTURE STATEMENT**

**UNIQUELY GUARD**

## SECURING THE HOMELAND

- Colorado and Alaska Army Guard Missile Defense Battalions support DoD's mission to defend against incoming inter-continental ballistic missile threats.

- Flying the ski-equipped LC-130 Hercules aircraft, the New York Air National Guard's 109th Airlift Wing provides airlift support to the National Science Foundation in Antarctica and Greenland. The 109th is the only unit in the U.S. military that flies the ski-equipped LC-130.

- Joint Task Force Empire Shield, funded by DHS, employs New York National Guard members, in state active duty status, to augment security forces protecting New York City rail and air hubs.

- The National Guard will activate 13 additional cyber units spread throughout 23 states by the end of fiscal year 2019. Uniquely postured to provide cyber capabilities through its cyber protection teams, network warfare squadrons and cyberspace operations squadrons, the Guard fulfills a critical mission as part the Department of Defense's cyber force.

- The Joint Air Defense Operations Center, supported around-the-clock by Army and Air National Guard personnel, is the heart of a sophisticated defense capability that incorporates jet fighters and air defense artillery units to defend National Capital Region airspace.

- The Army Guard's 117th Space Battalion is the only such battalion in the Army Guard and provides space-based capability through satellite communications, GPS awareness and accuracy, and forecasts on the impacts of space weather on communications capabilities.

- For more than 20 years, National Guard Soldiers and Airmen have supported local law enforcement and U.S. Customs and Border Protection along the Southwest border. Army Guard Soldiers from more than 20 states participated in a variety of support roles in FY15.



Table 1: Comparison of National Guard State and Federal Roles

|  | State role | | Federal role |
|---|---|---|---|
|  | State-funded | Federally-funded | Federally-funded |
| Command and control entity | Governor | Governor | President |
| Mobilization authorities used | In accordance with state law | Title 32 (32 U.S.C 502(f)) | Various Title 10 authorities |
| Where deployed | In accordance with state law | United States | Worldwide |
| Mission types | In accordance with state law | Training and other federally authorized missions | Overseas training and as assigned after mobilization |
| Examples of missions conducted in the United States | Forest fires, floods, civil disturbances | Post-9/11 airport security, Hurricane Katrina, southwest border security | Air sovereignty, missile defense, guarding DOD infrastructure |
| Support law enforcement activities | Yes | Yes | As limited by Posse Comitatus[a] |

Source: GAO analysis.

[a] The 1878 Posse Comitatus Act, 18 U.S.C. §1385, as applied by DOD, prohibits the direct use of federal military troops for domestic civilian law enforcement except where authorized by the Constitution or an act of Congress. This act applies to the Army National Guard of the United States and the Air National Guard of the United States, which are reserve components of the armed forces under 10 U.S.C. §10101.

The 2008 NDAA enhanced the functions of the National Guard Bureau.[8] Under the act, the bureau, which had previously been a joint bureau of the Army and the Air Force, became a joint activity of DOD, and the Chief of the National Guard Bureau became a principal advisor to the Secretary of Defense through the Chairman of the Joint Chiefs of Staff on matters involving nonfederalized National Guard forces. In addition the act specifies that the bureau will assist the Secretary of Defense in facilitating and coordinating with other federal agencies, the Adjutants General of the states, the U.S. Joint Forces Command and the U.S. Northern Command for the use of National Guard personnel and resources for operations conducted under Title 32 or in support of state missions. In addition to these enhanced functions, the National Guard Bureau also remains responsible for the administration of the National Guard, including participating with Army and Air Force staff in developing and coordinating policies, programs, and plans affecting Army National Guard and Air National Guard personnel, and it serves as the channel of communication

---

[8] Pub. L. No. 110-181, §§1811, 1812, and 1813 (2008).

Atch 3

Appendix C

National Guard Duty Status Chart

The following chart compares the various benefits and obligations of National Guard personnel in state and federal status:[1]

| | State Active Duty | Title 32 – AGR -IDT - AT- ADSW[2] | Title 10 – Federal Active Duty |
|---|---|---|---|
| Command & Control | Governor | Governor | President |
| Who Performs Duty | National Guard | National Guard | Active, Reserve & National Guard |
| Where Duty is Performed | Determined by State Statute | CONUS – EMAC[3] | Worldwide |
| Pay & Benefits | State Pay & Allowances | Federal Pay & Allowances | Federal Pay & Allowances |
| Tort Immunity | Under State Law | Federal Tort Claims Act | Federal Tort Claims Act |
| Posse Comitatus | Not applicable | Not applicable | Yes |
| Reemployment Rights | State Statute only | USERRA | USERRA |
| SCRA Protections | No | Yes – Limited | Yes |
| Missions | Determined by State Law | IDT, AT, AGR & other Federally Authorized | Federal only |
| Discipline | State Law | State Law | UCMJ |
| Federal Retirement | No | Yes | Yes |
| Medical Coverage | State Benefits only | Federal Benefits | Federal Benefits |
| Disability | State Workers Compensation | Federal Benefits | Federal Benefits |
| Involuntary Order to Duty | Determined by State Law | Yes | Yes |
| Voluntary Order to Duty | Determined by State Law | Yes | Yes |

---

[1] Adapted from a similar chart created by Colonel Bryan Morgan, Staff Judge Advocate, Alabama National Guard, January 2006 (on file with author).

[2] AGR – Active Guard-Reserve; IDT – Inactive Duty for Training; AT – Annual Training; ASDW – Active Duty for Special Work.

[3] EMAC is the Emergency Management Assistance Compact, a model code adopted by most states to provide for mutual aid across state lines during an emergency. Emergency Management Assistance Compact, http://www.emacweb.org (last visited Dec. 10, 2006).

Atch 4